## Case No. 13,348.

### STEELE v. THACHER.

[1 Ware (91 Davies), 85.] [1]

District Court, D. Maine. Dec. Term, 1825.

SEAMEN—CRUELTY OF MASTER—DESERTION—PARENT AND CHILD—ADMIRALTY JURISDICTION.

1. Repeated acts of cruelty and oppression on the part of the master will justify a seaman in deserting the vessel; but not a single act of assault and battery, although it may exceed the bounds of moderation, unless there be reasonable grounds for apprehending that such acts of oppression will be repeated.

[Cited in Bush v. The Alonzo, Case No. 2,-223.]

[Cited in Gabrielson v. Waydell, 135 N. Y. 19, 31 N. E. 969.]

2. The decisions of the courts of common law in England, under the statute of 13 & 15 Rich. II., upon the jurisdiction of the admiralty, are not binding on the courts of this country.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867. Cited in dissenting opinion in Waring v. Clarke, 5 How. (46 U. S.) 490.]

3. The grant of admiralty jurisdiction by the constitution of the United States has been uniformly held both by the legislative and judicial departments of the government, to be more extensive than that allowed by the courts of common law, under the construction of these statutes, to the high court of admiralty in England.

[Cited in U. S. v. The New Bedford Bridge, Case No. 15,867.]

4. If a tort be committed partly on land and partly on the high seas, if it be one continued act, the admiralty has jurisdiction over the whole matter.

[Approved in Plummer v. Webb, Case No. 11,-233.]

5. A parent may maintain a libel in the admiralty for the wrongful abduction of his child, being a minor, and carrying him beyond the sea.

[Cited in Mendell v. The Martin White, Case No. 9,419; The Dauntless, 7 Fed. 367.]

[Cited in Grand Rapids & I. R. R. Co. v. Shower, 71 Ind. 454.]

6. And this action may be maintained although the child, at the time of the abduction, was not an inmate of the father's family, and although the child may have been principally left to support himself by his own labor, unless it appears that the father has abandoned all care of his child.

[Cited in Magee v. Holland, 3 Dutch. (27 N. J. Law) 95; Wodell v. Coggeshall, 2 Metc. (Mass.) 93.]

7. The father is bound to support his children during their minority, and while he does this he is entitled to the custody of their persons and to the fruits of their labor. He may renounce or abandon his rights, but he cannot by his own act discharge himself from the obligation of supporting them.

This was what, in the technical language of the admiralty, is called a cause of damage, brought by Steele for certain wrongs alleged by him to have been done by the respondent, to his son, being a minor under the age of twenty-one. The libel alleged that in February last, Capt. Thacher, master of brig Jane, at Portland, shipped John Smith Steele, the libellant's son, to go a voyage on the high

seas from Portland to the West Indies; that in pursuance of this contract the said John went the voyage from Portland to Grenada, and was thus transported out of the state without the parent's consent, by which means he has lost the services and society of his son, etc. In another allegation, the master is charged with divers assaults and batteries on the said John, by means of which the father has lost his services, etc. In a third allegation, the master is charged with having by his ill-treatment tortiously discharged and abandoned him in a foreign port. In a fourth, a discharge by consent is alleged, so far as a minor could consent. The master, in his answer, alleged that he shipped John Smith, who is proved to be the person in question, as the apprentice of one William G. Johnson, at the request of said Johnson, and denied that he is the son of the libellant; denied the assaults and batteries, any further than was justifiable as moderate correction, and denied the discharge, and charged a desertion by the said John Smith. It was proved at the trial, that John Smith Steele shipped, as is alleged in the answer, by the name of John Smith; Johnson was surety for the month's wages which were paid in advance, and expended in clothing. His name is on the shipping paper immediately under Steele's, and below it is a memorandum in these words: "Mr. Johnson signs as surety that he is an apprentice to him." Something appears to have been said at the time of shipping, of the boy's being Johnson's apprentice, but no indentures were shown or asked for; and in his deposition, Johnson says that the memorandum was written after he signed, and that he never understood what it was until it was exhibited to him on the trial. He says that Steele never was his apprentice, but that he took him to teach him the trade of a barber, and, not being satisfied with his conduct, had dismissed him. Steele performed the outward voyage, and deserted at Grenada, since which he has not been heard from. He was proved to be the son of the libellant, by a witness who was present at the marriage of his parents, and at his birth, and who had seen him occasionally since. The testimony of this witness, to which exception was taken in the argument, was corroborated by the unexceptionable evidence of Mr. Costelow, who knew him as a member of the libellant's family, and that he was commonly considered as his son, by his neighbors. Against this testimony nothing was opposed but a doubtful rumor that he was the son of the libellant's wife, before marriage. It was in evidence that John lived in his father's family until about eight years ago. Since that time it does not appear with certainty where he has lived. The libellant's witness says he supposed he lived with his father, or elsewhere by his consent, but not living in the same town with the libellant, he cannot speak with certainty. It was proved by the respondent that he had been in Portland about seven weeks, at the

[1] [Reported by Hon. Ashur Ware, District Judge.]

time of his shipping; that when he came here he stated that he was his own man, acted for himself, and engaged himself to Johnson as an apprentice, to learn the trade of a barber. It does not appear that during this time the father claimed authority over him, nor does it appear that he knew where the boy was, or made any inquiries for him. But the son acted independently, and represented himself to be an emancipated minor.

Orr & Daveis, for libellant.
Longfellow & Adams, for respondent.

WARE, District Judge. In considering the questions which arise in this cause, we may begin by laying out of the case the second, third, and fourth allegations in the libel, as being unsupported by any satisfactory evidence. There is no color of proof to support that part of the libel which relies on an assault and battery, and a consequent loss of service. Admitting the battery to be proved, this part of the libel can only be sustained by proof of a consequent loss of service, and there is not a particle of evidence which goes to establish that fact. The allegation of a discharge by consent is distinctly negatived by direct proof of a desertion. As to the other point, that Steele was, by the cruelty of the master, compelled to leave the vessel, the evidence is by no means satisfactory. It is in evidence that the master corrected him on the outward passage, but it is also shown that he was negligent and careless in the discharge of his duty, and insolent in his manners. The marine law authorizes the master to correct the negligent or disorderly conduct of a mariner by moderate chastisement, and he does not seem, in this instance, to have exceeded those limits which the law allows and justifies. Much less can it be pretended that there was such harshness and severity as would justify a seaman in abandoning the vessel.

There may be cases of such extreme and persevering cruelty on the part of the master as will justify him in deserting. But it must be a strong case. I am, as at present advised, far from being prepared to hold that a battery, simply because it is excessive, will be a justification, even though it should pass very considerably beyond the limits of a moderate discretion. As a general rule, it seems to me that another ingredient should enter into the case. The seaman who proposes, on this ground, to justify a desertion, should not only exhibit proof of the injury, but a just and reasonable ground of apprehension that it would be causelessly repeated, either by showing a general disposition to cruelty on the part of the master, or the existence of some particular pique or malevolence toward him personally. The policy of the law discourages the separation of the mariner from the vessel before the termination of the voyage, especially in a foreign port. But in the present case there is not only an entire failure of any proof of this kind, but the pretext is not made out of unreasonable severity in the particular instance alleged. We are brought back to the first allegation in the libel, the shipping of John Smith Steele, and transporting him out of the country without the consent of his father. But it is contended that admitting the illegality of the master's conduct, and that he may be holden to answer it in the proper form, the subject-matter of this allegation is not within the jurisdiction of this court.

In the much disputed question, as to the extent and boundaries of the admiralty jurisdiction, it has never been a matter of doubt whether this court had jurisdiction over torts committed on the high seas. In former times, it seems to have been thought that for such torts a remedy could be given by no other court. Such appears to have been the opinion of Lord Coke, the great antagonist of the admiralty; at least, such seems to be the most obvious meaning of his words. "Altum mare," he says in his commentary on Littleton, "is out of the jurisdiction of the common law," and "within the jurisdiction of the Lord High Admiral." Co. Litt. 260a. And in his argument against the jurisdiction of the admiralty, in 4 Inst. 140, the jurisdiction of this court over all things done exclusively on the high seas is admitted in its fullest extent, and the whole tenor of his argument implies that it was exclusive of that of the courts of common law. Blackstone apparently adopted the idea of Coke, for he speaks of injuries done on the high seas as being "out of the jurisdiction of our ordinary courts, and therefore to be remedied in a peculiar court of their own." 3 Bl. Comm. 106. The points which are labored by Coke with the greatest earnestness, are, 1st, That if any part of the transaction takes place within the body of a county, the jurisdiction of the common law attaches to the whole, and that wherever the courts of common law can take cognizance of the matter, the jurisdiction of the admiralty is excluded. On this ground, it is argued that when a marine contract is made on land, to be executed wholly on the high seas, the admiralty is ousted of its cognizance of the cause, for the common law attaching to the contract from the place where it is made, withdraws the subject-matter, which is clearly and, it would seem to be Coke's idea, exclusively of admiralty jurisdiction, from the cognizance of that court to the courts of common law. The notion of a concurrent jurisdiction seems not to have occurred to him as a possibility, or to have been studiously and cautiously kept out of view. Each jurisdiction appears to stand in his mind as exclusive of the other. 4 Inst. 136, Mich. 31, 11, 6, note 315; Id. 140, Temps. E. 1, tit. "Avowry," 192; Id. 141, 7 R. 2, tit. "Trespass on Statute." pl. 54.

The second point pressed in his argument is, that harbors, creeks, havens, rivers, &c., are within the body of some county, and that

all matters there transacted are within the jurisdiction of the courts of common law, to the exclusion of the admiralty. If the exception taken in the present case can prevail, it must be on the ground that the tort was committed partly on the land. Whatever authority the opinion of Lord Coke might have had with the age in which he wrote, certain it is that his reasoning has not been considered as satisfactory by succeeding judges; for though the jurisdiction of the admiralty over matters taking place wholly on the high seas remains now undisputed, yet, either by right or by wrong, the courts of common law have acquired over the same matters a jurisdiction which at this day is equally unquestionable. Lindo v. Rodney, 2 Doug. 614, note. The principle, also, that if a thing be done partly on the land and partly on the high seas, the jurisdiction of the admiralty is excluded, has been shaken by the exceptions of bottomry bonds and mariner's wages. Over these contracts, though made on land, the admiralty exercises, in opposition to the opinion of Lord Coke, an undisturbed jurisdiction. But with these exceptions, the doctrine held by Lord Coke is supported by a series of judicial decisions in England, which decisively establish it as the law of that country. It is on this principle that the jurisdiction of the admiralty is excluded in cases arising on policies of insurance, charter parties, bills of lading, and contracts of material-men, these contracts being made on land. Yet in each of these cases except the last, which is executed on land, if the parties went on the water to enter into the contract, the jurisdiction of the admiralty would attach, and yet it is most certain that that of the courts of common law would not be excluded. So far, therefore, as Lord Coke is considered as holding the doctrine that these jurisdictions are reciprocally exclusive of each other, his opinion is not law at this day.

But the courts of this country have not considered themselves as bound by the opinion of Lord Coke, and the decisions of the common law courts of England on writs of prohibition. These decisions are founded on the construction of the statutes of 13 & 15 Rich. II., which have been held not to extend to this country. The construction which they have at different times received has not been uniform in England, and that upon which the courts of that country have finally settled down may justly be ascribed fully as much to the jealousy of the courts of common law as to the application of any just rules of interpretation. De Lovio v. Boit [Case No. 3,776]. The vice admiralty courts in this country, before the Revolution, always exercised a larger jurisdiction than the high court of admiralty in England. De Lovio v. Boit [supra]. And the grant of admiralty and maritime jurisdiction in the constitution has, both by the legislative and judicial departments of the government, been construed to be more extensive than

that exercised by that court under the construction of the statutes of Richard II. The judiciary act puts all revenue seizures made on waters navigable from the sea by vessels of ten or more tons burden, on the admiralty side of the court, an extent of jurisdiction palpably at variance with the construction given to those statutes by the courts of common law. 2 Bior. & D. Laws, c. 20, p. 63, § 9 [1 Stat. 76]. The decisions of the courts of the United States are so numerous and full to this point, that it is barely necessary to refer to a few. In the case of The Gen. Smith, 4 Wheat. [17 U. S.] 438, the admiralty is held to possess a general jurisdiction in cases of material-men, by proceeding either in rem or in personam. So in The Jerusalem [Case No. 7,294]; Stevens v. The Sandwich [Id. 13,409]; North v. The Eagle [Id. 10,309]. In the case of Manro v. Almeida, 10 Wheat. [23 U. S.] 473, the court decided that an admiralty court may proceed by attachment to compel the appearance of a party in torts as well as contracts, though such process would not be allowed in England. In the case of The Apollon, 9 Wheat. [22 U. S.] 363, the seizure was made in Belle river, within the admitted jurisdiction of the king of Spain, and brought to the port of St. Mary's for adjudication. The master brought his libel against the collector for the damages occasioned by the illegal seizure. Here no part of the tort, from its inception to its termination, was committed on the high seas. It commenced within the acknowledged jurisdiction of a foreign power, and was consummated within the body of a county in the state of Georgia. Yet the jurisdiction of the admiralty does not appear to have been questioned. In fact the distinction taken in the English reports, that where a thing is done partly on the land and partly on the high seas, the jurisdiction of the admiralty is excluded, has not, to my knowledge, received the sanction of any judicial decision in this country, but on the contrary it has been most explicitly denied. De Lovio v. Boit [Case No. 3,776].

In this case the question as to the jurisdiction must be determined by the locality of the act, whether it was done on the high seas. The act, complained of by the libellant, is the shipping his son, a minor, at Portland, and transporting him to parts beyond the sea, to wit, to Grenada, in the West Indies, without his consent. The contract was made on shore; but the contract, admitting it to be illegal, does not constitute the tort. The execution of the contract is that in which the tort consists, and that was on the high seas. If it be said that it had its inception on land, and within the body of a county, the answer has been already given, that the English cases on this point are not held to be law in this country; but where the substance of the tort is committed on the high seas, when it there has its consummation, if it be all one continued

act, the jurisdiction of the admiralty will attach to the whole matter, though part of it may have taken place on land and within the body of a county. This principle seems to be reasonable in itself, and in the mass of inconsistent and contradictory authorities with which the English books abound, on the subject of admiralty jurisdiction, we can find direct authority for it, though I will not contend that it stands uncontradicted. In Com. Dig. tit. "Admiralty," F. 5, it is said: "If the libel be founded on a single continued act which was principally on the sea, though part was on the land, a prohibition will not go." Such, precisely, is the present case. On the whole, I cannot bring my mind to doubt but that this court, sitting as a court of admiralty, has a clear and undoubted jurisdiction over the subject-matter of this allegation in the libel. I might have disposed of this part of the case by simply referring to the case of De Lovio v. Boit [supra], where the whole question of the admiralty jurisdiction is discussed with an ability and learning which leaves nothing to be added to the subject. But the objection was strongly urged by the counsel for the respondent, and as the point raised in this case, was not before the court in judgment in that referred to, a respectful attention to the argument of the learned counsel required that it should be fairly examined.

We come then to the question on its merits arising under the first allegation of the libel, the wrongful abduction of the libellant's child. It is argued that there is no sufficient proof that John S. Steele is the libellant's son. Though the testimony on this point is not very direct nor positive, it is such as in the absence of any conflicting proof ought to be held as satisfactory. This fact being considered as settled, the general authority and rights of a parent, as far as it is necessary to consider them in the present case, are not the subject of doubt. That he has the general right of control over his child, and is entitled to the custody of his person and to the fruits of his labor, is not questioned. A stranger who violently or clandestinely withdraws the child from the parent's authority, and appropriates to himself the fruits of the child's industry, does a wrong to the parent for which the law will give him an appropriate remedy. Nor is it perceived that the case will be altered in principle by the child's consent to the fraud on the parent. For this purpose he has no legal consent to give. James v. Le Roy, 6 Johns. 274. And so far as it is an attempt to conclude the rights of a parent, it is utterly void.

But these parental rights may, like other rights, be waived or renounced, and that either expressly or by implication. The parent may renounce his right to the earnings of his child, by a special agreement with the child that he shall have the exclusive enjoyment of them himself. Besides, these parental rights are connected with parental duties, and may be forfeited by a neglect of these duties. The parent is bound to maintain, to protect, and to educate his child; and this is an obligation that is imposed upon him by the law of nature, independent of the municipal law of the state. His right of control over the person of his child, and that of taking to himself the fruits of his labor, have their foundation in the performance of these duties. If the parent turns his child out of his house, and refuses to maintain him, or if he abandons all care of him, suffers him to go at large, withholds all support and protection of his child, and obliges him to support himself, he forfeits his right of control over his person and all claims to the fruits of his labor. By such a renunciation of the parental power the child becomes, in a qualified sense at least, independent and competent to act for himself. He violates no duty of filial obedience and infringes no parental rights, by entering into engagements with others by which he may provide for his own wellbeing, nor can such engagements be impeached by a parent who neglects to discharge towards his child his own parental obligations. To allow a parent such a control over his child, while he contributes nothing to his support or protection, or to uphold the parental rights while all the parental obligations are neglected, would be giving an extension to the parental power that it seems to me is neither sanctioned by the law of nature nor by our own municipal law. When a minor child is thus abandoned, a stranger may enter into any proper contract with him for his labor, and pay the minor his wages without being liable to account to the father. These principles, which seem reasonable in themselves, are sanctioned by the most approved elementary writers on the law, as well as by judicial decisions. 1 Bl. Comm. c. 16; Jenney v. Alden, 12 Mass. 375; Nightingale v. Withington, 15 Mass. 272. The libellant has, therefore, no just cause of complaint against Capt. Thacher for entering into this contract with his son; and if I rightly understand the authorities, he could maintain no action in his own right for the wages of his son if the contract had been faithfully performed on his part.

But different considerations arise when the father sues for a wrong done to his child. Though a father may renounce his rights, he cannot, by any form of renunciation, annul his obligations. These are imposed by the law, and do not cease to be binding, or lose any of their obligatory force, because he neglects to fulfil them. The father is bound to support his children during their minority, and this is an obligation from which he cannot discharge himself by any act of his own. As some compensation for the performance of this duty, he is entitled, during the same

period, to the fruits of their labor. But the obligation does not depend on their ability to recompense him by their industry, for he is equally bound to support them whether in sickness or in health. If Capt. Thacher had in this case, by any personal injury, disabled the boy from supporting himself, and thrown him back as a charge on his father, this would have been an injury for which the father might have recovered damages. For there is no principle of law more universal than this, that every one is bound to repair the damage which is occasioned by his own wrongful and illegal act. But this is not the gravamen that is charged in the libel. The ground of the libellant's complaint is the abduction of his child, that he is carried out of the country, withdrawn from his care and protection, and not returned, whereby he is deprived of the benefit of his services, of the comfort of his society, and of the control of his person. The question is, whether upon the facts proved in this case, he is entitled to claim damages on this ground. It does not appear from the testimony that the son had been an inmate of his father's family for the last seven years; nor is, indeed, the contrary proved, though it seems rather the more probable inference from the whole testimony taken together. For the last seven months, at least, he has been a resident in this town, has acted for himself, free from all oversight or control on the part of his father, maintaining himself by his own industry, and engaging his services to whom he pleased. When a minor is left in this way to support himself by his own resources, without any aid or care from his parent, the parent can surely maintain no suit for the loss of his services against a stranger who gives him employment and pays him wages, for this is all the means of support which the neglect of the parent has left him.

But it does not necessarily follow, because the father has left his child principally to his own guidance, to make his way in life as he can, and support himself by his own industry, that he has renounced all care of him, and abandoned all interest in his welfare. A child may live abroad, and that parental oversight and control over him be retained in a great degree, which is so salutary and important to the inexperience of youth, when it is exercised with prudence and discretion. If a father is unable, from poverty, to discharge all the duties to his offspring, which the parental relation imposes on those who are in more affluent circumstances, it is not to be presumed, without proof, that he voluntarily neglects those which are within his power. He may feel as deep an interest in the wellbeing of his children as those who are more fortunate in being able to contribute more towards that object, and his paternal authority may be exercised with great benefit to them in many ways. These domestic rights of the poor are as sacred in the eyes of the law as those of the rich, and are often, without doubt, employed as wisely and with as salutary an influence. The public has also a deep interest in maintaining this paternal power and domestic discipline when it is employed for the good of the child, in preserving him from vice and dissoluteness, and training him to habits of industry and sobriety. It seems to me, therefore, that the abduction of a minor child, and withdrawing him from the supervision and control of the parent, even if he is not an inmate of his father's family, and though he may be principally left to support himself by his own exertions, unless it appears that the father has abandoned all care of his child, is a wrong to the parent for which he is entitled to a remedy.

When Capt. Thacher shipped Steele, he knew him to be a minor, and though he might, under the circumstances, be justified in entering into the contract with him, he could hardly be authorized to conclude that his father and natural guardian had abandoned all his parental rights. If the allegation in the libel were proved that he wilfully and intentionally left him in a foreign country, or if it were shown that he neglected to bring him home when he might have done it, or that by his harshness and cruelty he had driven him to a desertion, my opinion is that the libellant would be entitled to damages. The difficulty, in my mind, does not lie in the principles of law upon which the counsel have put the case, but in the proof. There is no positive proof that the master refused to bring him back; on the contrary, it is admitted that he deserted. But it is contended that there was a criminal neglect in not securing him after his desertion, for the purpose of bringing him home, which, as he was known to the master to be a minor, he was bound to have done. It is stated by one of the witnesses that he saw Steele several times after his desertion, near the vessel. But there is no evidence that this fact was communicated to the master, or was known by him. It is said by another witness that the master, on the outward voyage, expressed his dissatisfaction with Steele, and said he wished he could make him desert. This would deserve consideration, connected with other circumstances, if his treatment of Steele were such as to tend to produce that result. But there is no evidence of unreasonable severity on the part of the master towards him. Steele was sometimes corrected, but his conduct was such as to justify the correction. Upon the whole, my opinion is that the libel ought to be dismissed.